Newcomb *v.* Ketteltas.

[NEW YORK GENERAL TERM. April 9, 1855. *Mitchell, Roosevelt* and *Clerke,* Justices.]

---

## NEWCOMB *vs.* KETTELTAS and others.

Trustees, having the legal estate in lands, with a duty to perform in respect to the rents and profits, and without any restriction upon the right to lease, may lease vacant lots for twenty-one years, and covenant that the lessees shall have a renewal, for a further term of twenty-one years, at a rent to be appraised, or be paid for such buildings as they may erect during the first year of the term. And such covenant may be enforced against a new trustee.

Where it was the understanding between the parties to a lease, that an alley should be used in common between the demised lots, but by mistake this provision was not inserted in the lease ; and subsequently the lessor, on a further consideration, granted the use of the alley to the lessee, for the residue of the

term, but omitted to provide that such use should continue during a renewal of the lease to which the lessee was entitled; *Held* that the original lease might be reformed, or the new one made to conform to the actual agreement.

THIS was an appeal by the defendants from an order made at a special term, overruling a demurrer to the complaint. The following opinion was delivered at the special term.

MITCHELL, J.   John Gardner made his will dated 2nd July, 1817, in such form as to pass real estate, and devised his estate to James Gardner, John Hyer and John Miller, their heirs and assigns and the survivors, &c. of them, and the heirs, &c. of the survivor, in trust during the lives of his son John and of his two daughters, in the first place out of the rents and . profits thereof to uphold, support and repair all his real estate and pay all taxes and charges, and next to pay to said son and daughters during their natural lives the residue of the rents of all said estate, viz ; two thirds to John so long as he should live, and the residue to his daughters, equally, so long as they should respectively live, and on the further trust if John should die leaving issue to pay to such issue the proportion of the rents to which John had been entitled, and if he died without issue, to distribute the said proportion equally between the two daughters during their respective lives, or if either of them should die without issue, then between the survivor and her issue.   He also appointed the said trustees his executors.   The testator died shortly afterwards, and his will was proved and letters testamentary were granted to the three executors.   John Miller died in 1825.   On the 26th of March, 1828, James Gardner and John Hyer, as surviving executors and trustees, executed a lease to the plaintiff of a vacant lot of land belonging to the estate, on Tompkins street, south of Broome street, 21 feet 6 inches by 75 feet, for 21 years from May 1st, then next, at a yearly rent of $60, payable quarterly.   The lessee was also to pay all taxes and assessments, except for regulating streets and filling in docks.   The lessee. also covenanted to finish before one year from the first of May then next, one good substantial building on the front of the lot, at least 24 feet high,

with a cellar 6½ feet deep and stone foundation, the front to be of bricks. It was mutually covenanted that at the expiration of the term the value of the buildings which should be erected in pursuance of the lease should be ascertained ·by two sworn appraisers, one to be chosen by each party, or by a sworn umpire to be chosen by the appraisers, and if the lessor should not pay to the lessee or his assigns such value within 30 days the lessor should again lease the premises to the lessee or ·his assigns for a further term of 21 years upon such rent as should be agreed upon by the parties, or be determined upon by the appraisers or umpire. The plaintiff did erect on the demised premises at his own cost a building in conformity to the requirements of the lease. A like lease was executed between the parties of the vacant lot next adjoining the one first described, and with the like covenants, and the plaintiff had also performed all the covenants contained in that lease. There was an alley ten feet wide between these two lots. The second lot was described as running easterly along a lot of ground leased to the plaintiff, but the dimensions of the two lots and the points of beginning would not include the alley; still it was understood between the parties, at the time of the execution of the lease, that the alley should be used in common for the two lots, and be kept in repair at their joint expense, but by mistake this was omitted in the leases, and to supply the omission and in consideration of $15, paid by the plaintiff towards regulating and flagging the alley, Mr. Hyer as sole surviving trustee, in December, 1831, granted to the plaintiff the use of the alley during the residue of the term; reciting the original understanding in the grant. It was intended that this right should also be contained in any renewal of the lease. A like lease was also executed to one Samuel Gage, of a lot on the corner of Tompkins and Grand streets, with like covenants; which were also fulfilled by the lessee, and he in April, 1829, assigned his lease to the plaintiff. Each of the three buildings so erected is now worth $1300. John Hyer was the sole survivor of the trustees, but is· now deceased; he was removed from the trust and Eugene Ketteltas, who married a daughter of the tes-

tator, and T. S. McCarty who married the other daughter, were appointed trustees in his place. McCarty is now dead and Ketteltas is sole trustee. The two daughters are living and have each several children; the son John, it is presumed, is also living.

Ketteltas now insists that the leases were void, and executed without any authority; and although the plaintiff named an appraiser on his part, to value the buildings, and requested Ketteltas to name one on his part, Ketteltas refuses to do so, and has served a notice to quit, on the plaintiff.

In executing the leases, the trustees acted discreetly and in good faith, and for the best interests of the estate and of the persons interested under the will. At the time of the testator's death his estate consisted in a great measure of vacant lots exceding one hundred in number, and in parts of the city then but little occupied, and these lots could not for the most part have been rented for any purpose except on building leases for like terms with those above specified, and could not have been leased on better terms for the estate than those specified in the leases. Other property in the city similarly situated, and belonging to other persons, was very commonly leased on similar terms. The terms on which the leases were executed were such as discreet and prudent men would have leased similar property upon, and the leases were in no respect improvident or improper, or so regarded when they were executed, by any judicious person.

The lots were subject to heavy taxes and assessments, and if they had been permitted to remain unproductive they might probably have been sold for taxes and assessments and lost to the estate; and the condition of the estate required that the lots should be made productive, in order to save the estate from great loss and destruction, and to furnish a proper support and education for the children. The rent usually reserved on similar leases does not exceed 5 per cent on the cash value of the land; the rents reserved in these cases were fully equal to that amount. These are the facts alleged in the complaint, and which are admitted to be true by the demurrer of De Dion and his wife.

The plaintiff prays for an injunction to prevent his being disturbed in the possession; for a specific performance of the agreement to renew the lease or pay for the buildings; or that the executors of Hyer should pay for the value of the buildings.

It is very plain that a gross injustice will be perpetrated on the plaintiff if he is refused all relief. Relying on the covenant that the lease should be renewed or he be paid the value of the buildings, he was induced to pay to the estate an annual rent of $180, and to erect on the three lots buildings now worth $3900. If relief is denied he loses the value of these buildings, and the estate gets them without paying a cent for them, and in violation of the covenant made on its behalf by the trustees.

The leases, too, were executed in perfect good faith and for the best interests of the estate, and the terms were the best that could have been obtained, and such as discreet and prudent men would have leased similar property upon, and such as were very common with other property similarly situated, belonging to other persons in the city. The lots were vacant, subject to heavy taxes and assessments, and liable to be sold for them, and so lost to the estate; and the condition of the estate required that the lots should be made productive, to save the estate and support the children. If the trustees, therefore, had power in any possible case to execute the leases, they were bound to execute them in this case; the omission to do so, if they had the power, would be a gross breach of trust.

The leases were not executed by virtue of any mere power in the executors, but by virtue of the legal estate vested in the trustees. That gave them at law an estate in fee, subject to be determined when the purposes for which the estate was created should have ceased. In the meantime they were to lease the property, in order to carry out the purposes of the trust, and they were especially required to sustain the estate out of the rents and pay the residue of the rents to the then children. *This directly exhibits the intention of the testator that the trustees should lease the property;* the trustees then being possessed of a fee though determinable, could at law execute leases for any number of years; as such leases though for 100 years,

would be less in law than the freehold estate held by the trustees. The trustees could not, however, under this right, incident to their estate, commit any serious injury to the estate; for although a lease in violation of the trust might be good at law, it would be set aside in equity. This was admitted, substantially, in the first point taken by the defendant, viz : " the trustees having the legal estate had the power to grant reasonable leases."

No one could well doubt that if all the facts above stated are true, these were reasonable leases, and that they were probably the only kind of leases that would have saved the estate from ruin. The leases are more favorable than a lease for 42 years at a fixed rent for the whole term, because they give an election to the lessors to renew the lease or pay for the buildings, and because if the lease is renewed the lessor has in the second term the benefit of the increased rent which the improved value of the property would·cause; an improvement caused in part by the occupancy of the estate by the plaintiff and the other lessees of the estate. In this respect too, it is more favorable than a lease in reversion or in future: that fixes the rent before its true value can be ascertained, and affords a cover for secret agreements for a low rent in consideration of a *bonus*, which it may not be easy to prove, and does not allow the lessor the right here given him of controlling the property if he chooses to pay for improvements, which he shall take when he refuses to renew the lease.

Where a mere power to lease is given, a lease in reversion may be bad, and it may be that a covenant to renew a lease is not authorized in such case. The power is construed strictly ; and the lessee acquires no title, even at law, unless the limitations of the power are complied with. A court of equity, therefore, not finding any legal title in the lessee, might not be able to help him. But where the trustee has the legal estate, he can pass this or any less estate out of it to another, and such other holds it subject to the trust, and if there be no breach of trust in the conveyance or grant or lease, there is no ground for a court of equity to disturb it. So if the trustee has the legal estate, but with a plain restriction on his right to lease, that may

operate as a limitation on the estate to be granted by him, and the lessee must see that the lease is within the restriction imposed. Such was the case of *Bones* v. *East London Waterworks Co.*, 3 *Mad.* 375–383; *Jacob*, 324 ) but the case recognizes the distinctions above stated. Lord Eldon says, (*Jacob*, 330,) "whatever limitation there may be to the power of leasing by the trustees, yet by virtue of their interest, they could make a lease good at law, and the question is whether the leases they have made by virtue of that interest are to be considered, under all the circumstances, as abuses of the trust." So a lease for 999 years is a plain abuse of the trust, on account of the length of the time, amounting substantially to an actual alienation of the land and preventing the lessors from having the advantage of the rise of rents, and the fall in the value of money ; accordingly, such a lease, executed in 1715, was set aside, as a breach of trust, not as being void, in *Attorney General* v. *Green*, (6 *Ves.* 452.) The same learned chancellor, in *Attorney General* v. *Owen*, (10 *Ves.* 560,) says it is competent for trustees to make a lease for 99 years, and it may be a reasonable transaction, though it must be so in very few instances ; and the court looking at a transaction that aims at the alienation of a charity estate for 99 years, will put it upon those who were dealing for and with the charity estate to show that it is reasonable. Thus admitting that ever so long a lease may be valid, but that a court of equity will very properly throw the burthen of proving it to be reasonable upon the lessee and trustees; and that if they can prove it to be reasonable, under the circumstances of the case, it will be sustained. He states that ordinary husbandry leases are for 21 years ; that is where the farm is in a condition to be profitable without expenditures upon it. He also shows that "building leases are sometimes made under a settlement for 60 or 90 years ; but not for the same rent during the whole term. There is no rent for the two or three first years, until the buildings are covered ; and then they are at a rent generally not decreasing to the end of the lease, but increasing." He then lays down a rule peculiarly applicable to this lease, saying, " upon a devise to A. in fee, in trust for his infant son, to be con-

veyed to him at the age of 21, without imposing terms upon the trustee as to the rent, the length or terms of the lease, this court would say the trustee was to do what was reasonable, and it would be monstrous to hold that he could alienate the land for 99 years, at a stationary rent. The court would put it both upon the trustee and the lessee taking under him to show that the act was reasonable and done in the fair management of the estate." He thus points out that a lease for 99 years would be unreasonable if the rent were stationary, but not if it was to vary according to the change of times ; and that if the lessee could show it, in any case, to be reasonable, it should be sustained, but that the burthen of proof in such long leases was on the lessee ; and that building leases may be for 60 or 90 years with a varying rent, and be deemed reasonable.

This clearly covers this case. He repeated the same views in *Attorney General* v. *Brooke*, (8 *Ves.* 326,) " that if a trustee of a charity estate will make a lease for 99 years it is incumbent on the lessee taking a term of that duration to show a consideration making that a proper lease ; as in the ordinary course of a provident management of the estate, it is not." He adds, " it is impossible here to contend that trustees for a charity can make a lease with covenants for a perpetual renewal." He would avoid the covenant for perpetual renewal, but say nothing against a covenant for one renewal. In *Attorney General* v. *Buckham*, (17 *Ves.* 283,) a lease had been given in 1775 for 80 years, in consideration of the surrender of a lease which had 21 years to run, and of a rent of £46 per annum and a covenant to expend £700 in new buildings. There was contradictory evidence whether the £700 had been expended, and it appeared that the expenditures were not in *new* buildings, but in repairing the old. It was insisted that this was an unnecessary grant in reversion, and without benefit to the charity. (*P.* 286.) Lord Eldon said, (*p.* 290,) he did not recollect any case in which the court had gone the length proposed by the counsel for the information, and that he would shrink from laying down the rule to an exent not warranted by the cases of *Attorney Gen.* v. *Green*, *Same* v. *Owen*, and *Same* v. *Griffith*, as he understood these

cases: that this court will not allow trustees for a charity to make a mere husbandry lease for 99 years upon terms, and at a rent which would be adapted to a lease for 21 years, and not improvable (or the rent not to be increased) for a century; and he adds (if I correctly understand his reporter) that in case of a building lease, if it be for 999 years, and is on terms of laying out money commensurate only to a lease of 99 years, it is bad, but that these cases have not gone the length to hold, that if a lease be made in consideration of a former lease it is sufficient for the attorney general, on his information, to state that it is a lease for 80 years, and therefore to be set aside. He accordingly ordered an inquiry whether the lease was upon reasonable terms, having regard to the rent reserved, the money expended in build-. ing or otherwise, and the duration of the lease; and added that the lease must be so unreasonable that the court may infer that it was fraudulent. A stronger authority need not be produced to show that the trustees have the right to make leases for 80 years, if made in good faith and on reasonable terms. The consideration of the surrender of a former lease is no stronger than that of expenditure in permanent improvements. As the right of the trustee to make the leases arises not from a power given to him over the estate of another, but from the interest he has in the lands devised to him, the right to covenant for a single renewal, for a reasonable period, and on reasonable terms, is as much an incident to his estate as the right to lease at once for the whole period covered by. the two terms. The last lease was practically like a lease in reversion being given on the surrender of a prior lease having 21 years to run; though the legal effect under a mere power to lease might be different.

The inquiry ordered by Lord Eldon is substantially that which is tendered by the plaintiff in this case—whether the leases were on reasonable terms, having regard to the rents reserved, the money expended in building, and the duration of the lease or otherwise. We know that these covenants are usual in this city with persons acting in a trust capacity. They are in the leases from Trinity Church, from the Dutch Reformed Church, the Sailor's Snug Harbor, and it is believed in all cases of large

Newcomb *v.* Ketteltas.

estates consisting of vacant lands, as in Rutger's estate and others.

The covenant of renewal therefore must be considered as good and binding on the testator's estate, and must be performed by the present trustee, unless he elect to pay for the buildings.

It is said that the complaint does not allege that the parcels of land belonged to the testator at the time of making the will. If they did not, under the circumstances of the testator's family, they escheated to the state, but both the lessor and the lessee are estopped by the indentures between them from setting up any such adverse title, and this point was waived on the argument.

As to the ten foot alley, the surviving trustee, Mr. Hyer, executed an instrument declaring that it was the original understanding of all the parties that the alley should be used in common between the two lots, and it is distinctly alleged in the complaint that that was the original understanding, and the trustee accordingly, on a further consideration, granted that use for the residue of the term, and by mistake omitted to provide that it should continue during a renewal of the lease. If the fact of such mutual understanding and mistake be established, this court can rectify the original lease, or make the new one conform to the actual agreement. The use of the alley in this way from the commencement of the lease to this time, and the fact that in one of the leases the line running east is described as running along land leased to the plaintiff, show that the alley was laid out at the time of the execution of the lease, in some way, and show that it was to be used for the benefit of these lots. This would be a sufficient appropriation of it to the benefit of these lots for the lessee to be entitled to retain the use of it. The right to the use of the alley must therefore continue to pass with the lease of the lots.

It is no cause of demurrer under the code, that too many parties are made defendants, and it was proper to make the *cestuis que trust* parties as well as the trustee; it was perhaps necessary. There is but one cause of action set forth under each lease, namely, that arising from the value of the building. Un-

der this one cause of action the plaintiff seeks alternative relief, viz: the renewal of the lease or the payment of the value of the building, and that payment be made by the estate or by the executors of the trustees who made the covenants. The executors have not demurred.

The trustees having the legal estate might agree that the rent to be paid, or the value to be paid for the building, should be determined by appraisers, if they could not agree with the lessee. That was not to delegate their power; but was substituting a friendly tribunal in place of a court of law, in a case in which they had a difference with a third party, not in a case in which they had discretion. The covenant to refer might be rejected, and then the court will interpose as they are asked to do now.

The demurrer must be overruled, with leave to the defendants to answer in twenty days after service of notice of the order to be entered, on payment of all costs caused by the demurrer."

*C. Bainbridge Smith,* for the appellants. I. The trustees had no express power under the will to lease any part of the realty, and it is only to be implied from the nature of the estate. The lease itself, stripped of the extraordinary covenants it contains, the trustees may have had the authority to grant. (*Vail* v. *Vail,* 4 *Paige,* 317. *Naylor* v. *Arnist,* 1 *R. & M.* 501. *Bowes* v. *East London W. W. Co.,* Jac. 329. *Pearse* v. *Baron, Jac.* 158. 1 *Taunt. R.* 109.)

II. The extent and duration of the estate vested by a will in a trustee are confined and restricted to such a partial or less extensive interest as are sufficient to carry out the purposes of the trusts. The trustees under the will in question, take a contingent determinable estate to be determined on the death of the children. (*Fletcher on Estates,* 69, 49, 50. *Lewin on Trustees,* 235, 476, *m.*) The will expressly declares: "That my said executors shall, during the lives of my said son and daughters in the first place, out of the rents, issues and profits thereof, uphold, support and amend and repair all and singular, my real estate, with all needful and necessary amendments, repairs and alterations, and pay, satisfy and discharge all costs,

expenses, charges and assessments, and all ordinances of the mayor and commonalty of the city of New York in anywise respecting or concerning the same." (1.) The rents, income and profits of the testator's real and personal estate are to be appropriated and disposed of in the manner set forth in the will. *Expressio unius est exclusio alterius.* (2.) The trustees had no power to allow the rent of the premises to accumulate for the purpose of paying for the buildings, and it is not alleged that there is any fund out of which the trustees can pay for them. (3.) There is no authority in the will to build or pay for any buildings, nor to create any charges upon the estate. To pay for buildings would divert the income of the estate from the objects expressly directed and provided for by the will. (*Pearse* v. *Baron*, *Jac* 158.) (4.) The trustees were to uphold and repair the estate. This did not empower them to grant building leases. But the leases in question were worse than building leases. Such leases require the lessees to build, and the improvements at the end of the term become a part of the freehold. (*Jones* v. *Verney*, *Willes*, 169. *City of London* v. *Nash*, 3 *Atk.* 515. *Lucas* v. *Cummerford*, 3 *Bro. C. C.* 366. *Bostock* v. *Blakeney*, 2 *id.* .653. *Lant* v. *Norris*, 1 *Burr.* 287. *Sinclair* v. *Jackson*, 8 *Cowen*, 543. *Jacob's R.* 158, 9. *Willes*, 169. *Sugden on Powers*, 490.) (5.) The covenant to pay for the buildings is in effect a mortgage of the estate, and yet it cannot be pretended the trustees had any authority thus to dispose of the estate. (6.) It is alleged that at the time of the leases the lots were subject to heavy taxes, and if they had been permitted to remain unproductive, *they might have probably* been sold for taxes and assessments, and wholly lost to the estate; and that the condition of the said estate required that said lots should be made productive, in order to save the estate from great loss, &c. The testator died in 1817, and the leases were granted in 1828, the condition of the estate at the time of the death of the testator is not averred. It is not alleged that the leases in question, containing the objectionable covenants, were necessary. By the leases themselves it appears that " all assessments for regulating streets and filling in docks " were to be paid by the

estate. The condition of the estate, whatever it may have been, did not enlarge the power given to the trustees, or enable them to enter into covenants not authorized by the will. Powers are construed strictly, and where the trustees had the power "to repair," &c., an estate, this, it was held, did not authorize them to grant building leases. (*Bostock* v. *Blakeney*, 2 *Bro. C. C.* 653. *Jones* v. *Verney*, *Willes*, 169. *Bridge* v. *Brown*, 2 *N. C. C.* 191. *Hill on Trus. Am. ed.* 571. *Woodf. L. and T.* 204. *Hexon* v. *Oliver*, 13 *Ves.* 114.) The power of the trustees is to be ascertained from the will and not from the condition of the estate. If the power was inadequate, the legislature only could have afforded the necessary relief. Although a demurrer admits the facts alleged, still it is only those facts that are relevant and well pleaded, and not conclusions of law. (*Hall* v. *Bartlett*, 9 *Barb.* 297. *Ford* v. *Peering*, 1 *Ves. jr.* 71. *Story's Pl.* 452.) The acceptance of rent does not make valid a void covenant in a lease. (2 *Sug. on Pow.* 190, 2d *Am. from* 7th *Lond. ed. Higgins* v. *Lord Ross*, 2 *Bligh*, 112. *Jones* v. *Verney*, *Willes*, 169. *Doe* v. *Watts*, 7 *T. R.* 82.) And it is not alleged that the cestuis que trust have done any thing to confirm the leases.

III. The court below sustained the leases in question upon the cited authorities of leases granted by charitable estates. There is no analogy between such estates and the one at bar. In charity estates the trustees have a perpetual interest in the premises ; and in considering the validity of such leases two points are to be attended to. First, that the lease be °for an adequate consideration ; and secondly, that it be for a proper and reasonable term ; while the estate vested in the trustees under the will in question may terminate at any moment. (*Hill on Trustees, Am. ed., p.* 674, 463. *Willis on Trustees,* 127. *Lewin on Trustees,* 235, 405. *Fletcher on Estates,* 69, 49, 50.)

IV. Where there is a general power to grant leases without mentioning the time when such leases are to commence, it only authorizes leases in possession, and not in reversion. (4 *Cruise Dig. p.* 304, §§ 25, 26, 27. 2 *Coke Lit.* 433, (*ed. Thomas.*)

*Pollard* v. *Greenville*, 1 *Ch. Cas.* 10. *Doe* v. *Calvert*, 2 *East*, 375. *Jackson* v. *Sinclair*, 8 *Cowen*, 543. (1.) The covenant in the lease is, that at the expiration of the term therein demised, the buildings are to be paid for, and in default thereof, a new lease within thirty days thereafter is to be given. (2.) A lease is said to be in reversion which is to commence at a future day, or where it is to begin from the determination of a lease in being. (4 *Cruise Dig.* § 23. 2 *Sug.* 361, 2, 2d *Am. from* 7th *Lond. ed.* *Bowes* v. *E. L. Waterworks, Jac.* 374. *Id.* 7 *Mad.* 375, 383.) Thus, in *Sugden on Powers*, it is laid down " where a lease ought to be granted in possession, a lease in *futuro* is void, and if it be made to commence only a day after the date of the deed creating it, is as fatal a variance from the power as if made to take effect at the expiration of one hundred years from the time; and the rule, we have seen, is the same in equity as at law. (2 *Sug. on Powers, p.* 361, 2. *Pugh* v. *Leeds, Cowp. p.* 714.) (3.) Where a lease ought to be granted in possession, a lease in *futuro* is void. (*Pollard* v. *Greenville*, 1 *Ch. Cas.* 10. *Doe* v. *Calvert*, 2 *East*, 375.) (4.) If a lease in reversion would be void, so, *a fortiori* must be a covenant for such a lease.

V. If the covenant to renew was valid the court could not decree a specific performance of it. By the terms of the lease if the buildings are not paid for within thirty days after the valuation, &c. the lease is to be renewed, leaving it optional with the lessors either to pay or renew. Specific performance cannot be decreed to lease premises, the rent of which is to be fixed by arbitrators. (*Wilkie* v. *Davis*, 3 *Mer. R.* 507, *and cases there cited. Gourlay* v. *Somerset*, 19 *Ves.* 431. *Whitlock* v. *Duffield*, 1 *Hoff. C. R.* 110, 117 *to* 120. *S. C.* 26 *Wend.* 55. *Tobey* v. *The County of Bristol*, 3 *Story*, 800. *Agar* v. *Macklew*, 2 *S. & St.* 420.) (1.) The same rule is applicable to the payment for the buildings, the value of which was to be fixed by the arbitrators. (*Id.*) (2.) The plaintiff's remedy in case the leases were warranted by the power, is not by an action for specific performance, but an action on the covenant

in which damages for the breach are to be assessed by a jury. (*Harnett* v. *Fielding*, 2 *Sch. & Lef.* 549, 553, 9.)

VI. Several causes of action have been improperly united. (*Code of Procedure*, § 144, *subd.* 5.) (1.) The complaint contains a cause of action upon the covenants against the late John Hyer, individually, and his executors are made parties for that purpose. This action is one sounding in damages, triable before a jury, and cannot now, nor ever could be united with an equity case for specific performance *against other parties.* One is triable before the court, the other before a jury. They do not belong to the same class, as required by the code. (*Code of* 1849, § 167, *under which the demurrer was put in.*) If the action were against the same parties they could not be joined, for the code expressly declares, that the causes of action so united must all belong to one of the classes named therein, " *and must affect all the parties to the action.*" How can the personal covenants of John Hyer affect the *cestuis que trust* in this action, if they were triable before the same tribunal, and how are the executors of Hyer interested or affected by the action for specific performance against the trustees and beneficiaries ? (2.) The complaint contains a cause of action upon certain covenants affecting the trust estate solely, for which a · specific performance is demanded of the trustee. This action is triable before the court, the summons is and would be for relief, while the summons in the cause of action set forth in the complaint against Hyer should be for a money demand upon contract, triable before a jury, who alone, unless by consent, could assess the damages. (*Alger* v. *Scoville*, 1 *Code R., N. S.* 303. *Id.* 6 *Pr.* 131.) In that case it was held that a complaint which demanded relief against two, against one in his capacity of trustee, and against the other in his individual capacity, contained causes of action which could not be united in one complaint; and further, that a cause of action triable by the court could not be united with a cause of action triable by a jury.

In *Pugsley* v. *Aikin*, (14 *Barb.* 114, 116,) the court said, " it has long been a well settled rule of law, that a cause of action against a testator cannot be joined with a cause of action

against his executors personally. (*Myer* v. *Cole*, 12 *John.* 349. *Reynolds* v. *Reynolds*, 3 *Wend.* 244. *Gillet* v. *Hutchinson*, 24 *Wend.* 184. *De Mott* v. *Field*, 7 *Cowen*, ·58.) This rule has not been changed by the code which authorizes the uniting of different claims against a trustee, by virtue of a contract, or by operation of law, *but does not permit a claim against a trustee personally to be united with a claim against the estate represented by him. Code*, § 167." The case at bar is stronger than the above ; for the action is brought not only against the defendant Ketteltas in his individual and representative capacity, but contains (as to Hyer's executors) a different claim and a different cause of action against different persons. (*See Spalding* v. *Spalding*, 3 *How. Pr.* 297. *Dows* v. *Green*, *id.* 377.) And yet in the opinion of the court it is said, " there is but one cause of action set forth in the complaint under each lease, namely, that arising from the value of the building. Under this *one* cause of action the plaintiff seeks *alternate* relief, viz. the renewal of the lease or the payment of the value of the building, and that payment *be made by the estate or by the executors of the trustees who made the covenants.* The executors have not *demurred.*" There seems to be a conflict of opinion between the decision in this case, and the code and the cases cited in accordance with the latter. (*See also. Furniss* v. *Brown*, 8 *How. Pr.* 59 ; *Stuart* v. *Kissam*, 11 *Barb.* 271.) True, it does not appear whether the executors have demurred or not, but the *cestuis que trust* have ; nor does it appear by the code that the right of demurring to a complaint for improperly uniting several causes of action is confined to the executors, or to any class of defendants. (§ 147.)

VII. As to the ten foot alley, which forms as much a distinct cause of action as any of the leases set out in the complaint, it is submitted the demurrer is well taken. The lease of this alley was granted on the 28th September, 1831, (the leases of the lots were in March, 1828,) for the remainder of the term *specified* in the leases of the lots, namely twenty-one years. It is afterwards alleged that it was " meant and intended that in case the demised premises, mentioned in said first and second inden-

tures, or any of them should be again leased that the right to all of said alley should be included in such renewed lease, in the same manner as if the privilege of using the alley had been expressed and granted in the original leases." (1.) It is not averred or pretended that the alleged intention or understanding *as to the renewal* is mentioned in the lease. The *understanding* recited in the lease, as appears from the complaint, forms a part of the consideration of the lease of the alley *for the specific term*. Nor does it appear *when* this *understanding* took place, whether before or after the execution of the lease for the *specified* term. (2.) Although a demurrer admits the facts alleged, still it is only those facts that are relevant and well pleaded and not conclusions of law. (*Hall* v. *Bartlett*, 9 *Barb*. 297. *Ford* v. *Peering*, 1 *Ves. jr.* 71. *Story's Pl.* 452.) If such "intention and understanding" *dehors* the lease is to override the statute, it would as well apply to a conveyance of a house and lot as to the lease of an alley. (3.) It is not alleged in the complaint, as suggested by the court, that this alley " was to be used for the benefit of these lots." (4.) Assuming the lease of the alley contained a covenant in all respects like the lease of the lots in question, it has already been shown that the court cannot decree a specific performance of such a covenant. (*See cases cited under fifth point.*)

*W. Silliman*, for the plaintiff. I. It appears by the complaint, that John Gardner devised the lots in question to his executors and trustees, upon certain specified trusts, without full and specific directions in regard to the management of the trust property, but leaving this in a great measure to their discretion. (*Hill on Trus.* 482) If in the exercise of this discretion, they committed some errors, their acts are not therefore necessarily void, especially when they acted under the advice of the most eminent counsel in the country. But the complaint shows that they committed no error, but acted for the greatest benefit of the estate, and saved the lots from entire loss. The fee of the land being vested in the trustees, their legal power over it was unlimited, and they might have given a valid legal conveyance

of the fee, or of any lesser estate, for any consideration that they thought proper. Their acts could only be questioned in a court of equity, even if they had violated specific and positive directions in regard to the execution of their trust. Equity will not declare void their acts, which are beneficial and necessary, and are not plainly prohibited. If done in good faith they will be sustained.

II. The defendants, De Dion and wife, cannot complain that they are made parties, for she is interested as one of the two surviving children of John Gardner, deceased, and one of the two *cestuis que trust* under his will, and if Ketteltas, the trustee, can succeed in obtaining the plaintiff's three lots for nothing, she will be entitled to near half the benefit of the speculation. Previous to the code, she would have been a proper party, among other things, for the protection of the trustee, and under the code, she is a necessary party, as being interested in the result of the suit.

III. The location of the ten foot alley between two of the plaintiff's lots, would give the right to the common use of it for the lots, if it had never been mentioned in any paper, it being an appurtenance. But the complaint shows that it was intended to include the alley in the leases, and that the omission to mention it in the leases was by mistake. The demurrer admits this, and the alley may therefore be regarded as included. The demurrer in this particular is bad, because this is shown for cause of demurrer to the whole complaint, and it applies only to part.

IV. The trustees had a right to mortgage the lands, or to bind them by covenant to pay for the buildings, and to appropriate the rents, which have been, or may be received for that purpose. But if they had no such right, they had a right to renew the leases, on proper terms. And having covenanted to do one of two things, if they have not power to do one of them, they must do the other, and renew.

V. It is claimed by the defendants that the trustees had only power to lease from year to year. If they had that power, there is nothing in the case to limit or confine it to a single year, but they might, on the same principle, in the exercise of an honest

and sound discretion, lease for two years, or ten years, or any other proper number. The complaint shows that they could not have leased at all from year to year, and that if they had not leased as they did, the property would have been lost to the estate. This the demurrer admits.

VI. The demurrer objects that the complaint does not allege that John Gardner *died seised* of the lots, but it does allege that he "*devised*" the lots, and the entire complaint shows that they were leased by his trustees, and that they are claimed by the defendants as belonging to his estate.

VII. The demurrer objects to the joining of the executors of the surviving trustee in the suit, who are made parties for the purpose of making them responsible for payment for the buildings, in case the covenants to pay should not be binding on the estate of Gardner. (*Code*, § 144.) The code does not warrant a demurrer for excess of parties, but only for want of parties. But these parties have an interest in the question whether the covenants bind the estate of John Gardner, for if they do not bind that estate, they bind the trustees and their estates. (*Hill*, 508. *Wood* v. *Hannan*, 5 *Mad.* 368.)

VII. The demurrer objects that different causes of action are united in the complaint. The causes of action are the covenants to renew or pay for the buildings, which must be performed by some of the defendants, and the principal controversy must be between the defendants themselves, and to some extent the complaint is in nature of a bill of interpleader between them. If the covenants do not bind the estate, they bind personally the trustees who executed them, it being a general principle that an agent or person professing to act under a power, if he exceeds his authority, binds himself personally.

IX. If the leases were void for want of authority in the trustees to make them, they have been abundantly confirmed in all their parts by the parties interested. (*Hill on Trustees*, 526. *Chitty on Cont.* 212.) The *cestuis que trust* could not select such parts of the leases as they pleased, and confirm them without confirming the rest. They could not avail themselves of the covenants to pay rent, and take away all or any part of the

consideration for which it was paid. They cannot take the rents and withhold the use of the lots, or of any thing else for which the rent was paid.

X. If the trustees violated their trusts, the lessees acted in good faith and in ignorance of such violation, and are not to be affected by it.

XI. The trustees have an interest not subject to the trusts declared, and out of it should pay for the buildings, if the trust estate is not bound. Guardians have a right to lease. The trustees here were guardians.

*By the Court,* CLERKE, J. The principal facts presented by this demurrer are, that John Gardner by his will, bearing date the 2d July, 1817, devised in fee his real estate, consisting of about one hundred vacant lots, in an unimproved part of the city of New York, to trustees, for the purpose, first, out of the rents and profits to keep the property in repair and to pay all taxes and charges; and, secondly, to pay the residue to his children during their lives, two-thirds to his son John, and one-third to his daughters; if his son should die leaving issue, his share to be paid to such issue; if without issue, to the daughters equally; if either of these should die leaving issue, such issue to take her share; if without issue, her share of the rents to be distributed between the survivor and her issue. These trustees he also appointed his executors and the guardians of his children.

Gardner died soon after the date of his will. James Gardner and John Hyer, surviving trustees and executors, on the 26th of March, 1828, executed a lease to the plaintiff of a vacant lot belonging to the estate, for 21 years from the 1st of May then ensuing, at the yearly rent of $60; the lessee covenanting to pay all taxes and assessments, except for regulating streets and filling in docks, and to finish before one year from the commencement of the lease, one good substantial building to be of brick, on the front of the lot, at least 24 feet high, with a cellar six feet and a half deep, with stone foundation. The lease provided that, at the expiration of the term, the value of the buildings should be ascertained by sworn appraisers, and if the

lessors should not pay to the lessee such value within 30 days, they should again lease to him the premises for a further term of 21 years, for such rent as should be agreed upon by the parties, or be determined by the appraisers or umpire. A similar lease of the next adjoining vacant lot was executed between the same parties. The plaintiff erected buildings in compliance with these leases, and has performed all the covenants.

At the time of the execution of these indentures, it was intended and understood, that an alley between the lots should be also demised; but, this having been omitted by mistake, Hyer, the sole surviving trustee, on the 12th of September, 1831, executed to the plaintiff an instrument, in which he demised the alley for the remainder of the term, for the consideration of $15, but, by mistake, neglected to provide that it should continue during the renewal of the lease. Hyer was afterwards removed from the trust, and Thomas McCarty and Eugene Ketteltas, the respective husbands of the testator's daughters, were substituted in his place. McCarty having died, Ketteltas remains sole trustee. Ketteltas insists that the leases are void. The main question, then, arising on the demurrer is, have trustees, to whom real property is devised in fee, power to execute leases of this description?

It is denied by the counsel, in support of the demurrer, that such trustees have any power to demise the premises for a longer term than a year. The objection that they have exercised power improvidently, would, of course, be a different question— an objection entirely within the corrective equitable control of this court. There is not the slightest ground for doubting, that in granting these leases the trustees acted with prudence, circumspection, and for the best interests in all respects of the *cestuis que trust*. Indeed, the method which they adopted in this disposition of the property, which at the time of the testator's death, consisted, as we have seen, of about 100 vacant lots, has probably saved a great proportion, if not the whole of it, from being consumed by taxes, assessments and other claims. This is not the only instance in which tracts of unproductive land in this city have been preserved by leases similar to these,

Newcomb v. Ketteltas.

and transmuted into fruitful sources of wealth. I will therefore merely consider whether the trustees had any power to demise this property for a longer period than a year.

It is, indeed, manifest, that the authority of a trustee over the legal estate vested in him, exists only for the benefit of the *cestui que trust*. Nevertheless, he can alienate the estate, either wholly or *partially*, to a purchaser for a valuable consideration. This is in fact an elementary axiom in the doctrine of trusts. Even when a trust is expressly circumscribed, and there is no doubt in regard to the limited extent of the power, the restriction is not so imperative as to preclude the exercise of the trustees' judgment. It is even affirmed that where the interests of the *cestuis que trust* require it, they are in some instances not only permitted, but are bound, to regulate their conduct by a sound discretion. Thus, trustees, appointed expressly for the purpose of supporting contingent remainders, have, in certain exigencies, concurred with the tenant for life in destroying them, and the *power* has never been successfully gainsayed. I adduce these instances, to show the extent, on general principles, of the discretionary power vested in trustees. We have seen that they are capable of alienating the property when the fee is vested in them; but, it is a well established principle, also amounting to an axiom, that all those who are capable of alienating property, or of entering into contracts respecting it, may make leases, which will endure as long as their interests in the thing leased, but no longer. (*Cruise's Dig. Leases.*)

The counsel for the defendant objects, that the cases cited by the court below relate to leases by *trustees of charities*, on the ground that the latter have a perpetual interest in the premises, while the estate, vested in the trustees under the will in question, may terminate at any moment. This may be a good argument to prove that the lease cannot endure longer than the trust continues; but it furnishes no reason to prove that it is, *ab initio* void, or that the trustee had no power to execute a lease at all for a longer period than a year. In short, I see no reason, upon principle, why there should be any difference, except

as to the precariousness of the term, between private and public trusts; the trustees in both cases are persons in whom the founder or testator has reposed unreserved confidence; and the principles continually applied to the one, are applicable to the other. When the mode of granting leases is .prescribed, the terms of the power must be strictly pursued.; where the power to grant them is expressly given, the trustees have a power, both in law and equity, to lease in the manner which to their judgment seems most beneficial; and, where no such power is expressly given, they must be guided by the general principles of the court, which will always interpose to secure the exercise of a reasonable discretion, or to rectify a departure from it.

Among the comparatively recent cases bearing any analogy to the present, that of *Naylor* v. *Arnitt*, which I find in 1 *Russell & Mylne*, 501, is almost precisely in point. It will be seen that this related to a private, and not to a charitable or public trust. A testator devised lands to trustees upon trust, out of the rents and profits to pay two annuities, and, subject thereto, to permit A. and after him his wife, to receive and take the rents and profits during their respective lives; and after the decease of the survivor, he devised the lands to their children. Held, that the trustees could grant a valid lease of the lands for a term of ten years. No express power to lease was given in the will. It was alleged, that the lease had been granted fraudulently and corruptly; but it was admitted on the argument, that the plaintiffs had not sustained this allegation; and the question then was, as in this case, whether the trustee had, under the will, power to grant a lease for a term of years. The master of the rolls declared that the trustees had power to demise the lands, and pronounced the lease valid. I am not aware that this decision has ever been disturbed, or even questioned.

With regard to the alley, the complaint expressly avers that the parties intended that the right to use it should be included in the renewed lease, in the same manner as if this privilege had been expressed and granted in the original leases. This is a mistake which it is the province of a court of equity to rectify;

although in entertaining an application to supply a defect of this nature, the court will require strong evidence. The demurrer admits the essential fact—the fact of the mistake—and the only question, therefore, is whether it is such a mistake as the court will rectify. The instrument is not voluntary, but founded on a consideration ; and was reduced into writing without containing the whole intent of the parties. It must, therefore, be reformed.

On the other points, presented by the demurrer, I also concur with the judge at special term, for the reasons given in his opinion, which it is unnecessary to repeat.

The order of the special term should be affirmed with costs.

[New-York General Term, April 9, 1855.  *Mitchell, Roosevelt* and *Clerke,* Justices.] .